Pamela J. MEYERS, Appellant (Defendant Below),

v.

Steven W. HANDLON and Dolores Goldman, Appellees (Plaintiffs Below).

No. 3–584A130.

Court of Appeals of Indiana, Third District.

June 20, 1985.

Rehearing Denied July 22, 1985.

Fred M. Cuppy, Kathryn D. Schmidt, Thomas, Burke, Dyerly & Cuppy, Merrillville, for appellant.

Steven W. Handlon, Rice, Rice & Handlon, P.C., Portage, pro se and for Dolores Goldman.

STATON, Presiding Judge.

Goldman and Handlon brought this action to enforce their contingency attorney fee contract. The amount of their attorney fees was contingent upon the value of the property settlement obtained for Mrs. Meyers in her dissolution action. A partial summary judgment was granted by the trial court which eliminated Mrs. Meyers' affirmative defense that a contingency attorney fee contract in a dissolution action is against public policy, void, and unenforceable. She appeals from the granting of this partial summary judgment.

The sole issue for our review is whether contingency attorney fee contracts in dissolution actions are against public policy in Indiana. We conclude that they are against public policy and reverse the partial summary judgment granted by the trial court.

Before Mrs. Meyers signed the contingency attorney fee contract with Goldman and Handlon, she had been represented by another attorney. Her protracted dissolution proceedings had been punctuated by displays of hostility, frequent disputes, and acts of physical violence. On June 8th, 1978, Mrs. Meyers' marriage was dissolved, and she had agreed to a partial property settlement of $20,000.00 in cash for her interest in certain property. The balance of the marital property distribution was set for hearing on August 3, 1978 by the trial court. Later, on July 11, 1978, Mrs. Meyers met with Goldman regarding the balance of the property to be distributed in the dissolution proceeding on August 3, and discussed her dissatisfaction with her present attorney. After her meeting with Goldman, she fired her attorney.

On the same evening that she had met with Goldman, her husband, Dennis Meyers, came to her home and physically abused her. Later, he damaged her home and car. In fear of further physical abuse and property damage to her home, Mrs. Meyers called Goldman for advice. Goldman told her that there was nothing that she could do since she did not represent her but advised her to leave her home with the children until July 18 when Goldman would have an employment contract prepared for her to sign.

When Mrs. Meyers arrived at Goldman's office on July 18, she was presented with a five page contract detailing the conditions of Goldman's representation. The contract set forth the difficulties that Goldman expected to encounter because of time restrictions. It stressed the uncertainty of secreted and undervalued assets. Furthermore, Goldman would need the assistance of another attorney, Handlon. Total time for the two attorneys would be no less than one hundred fifty hours at $80.00 per hour per attorney. If a continuance of three months or more was granted by the trial court for the distribution of property hearing, the hourly rate of $80.00 per hour per attorney would remain the same, but if a continuance of less than three months were granted, the hourly rate would be increased to $150.00 per hour per attorney. The contingency provisions of the contract were as follows:

> "Attorney fees based upon results, which will be in addition to fees charged on an hourly basis, will be determined as follows:
>
> (1) if we obtain a net property distribution for you of more than $150,000.00, but less than $175,000.00, additional attorney fees will be $5,000.00;
>
> (2) if we obtain a net property distribution for you of more than $175,000.00,

but less than $225,000.00, additional attorney fees will be $10,000.00;

(3) if we obtain a net property distribution for you of more than $225,000.00, but less than $300,000.00, additional attorney fees will be $15,000.00;

(4) if we obtain a net property distribution for you of more than $300,00.00 [*sic*], additional attorney fees will be $20,000.00.

In determining the net value of the property distribution which we obtain for you, the sum of all values and monies to be received by you, less outstanding indebtedness, will be used, regardless of whether such sums are payable immedi- ately or in the future."

After the contingency attorney fee contract was explained to her, Mrs. Meyers signed the contract.

The property distribution hearing was continued to September 26, 1978. Three days were spent at the hearing before Mrs. Meyers' husband offered to work out a property settlement agreement. On October 4, 1978, a final property settlement was reached which provided: 1) each party would pay their own attorney fees; 2) Mrs. Meyers would be responsible for all unpaid appraisal fees, accounting fees incurred by her; 3) Mrs. Meyers was to receive $340,000.00 of the marital assets which included the family residence, $106,000.00 in cash, two fourplex apartment buildings, and personal property valued at $13,000.00.

This property settlement agreement was submitted to and approved by the trial court. There is no indication in the record that the trial court knew of the contingency attorney fee contract or that it had ever approved of the contract as part of the property settlement agreement.

Several months later, March 1979, Goldman and Handlon submitted a statement

for attorney fees to Mrs. Meyers. The statement indicated that approximately three hundred hours were billed at $80.00 per hour and ninety-three hours were billed at $60.00 per hour for a total of $29,546.00. In addition to the hourly charge of $29,546.00, the statement added a bonus of $15,000.00 as provided under the contingency attorney fee contract for a total of $44,546.00. Mrs. Meyers was given a credit of $20,000.00, an amount equal to the partial property settlement which she had paid Goldman previously. This left a statement balance of $24,546.00.

■ Where neither the essential facts nor the inferences to be drawn therefrom are in dispute, our task in reviewing the granting of a partial summary judgment is to determine whether the trial court properly applied the law to the facts of the case. *Kahf v. Charleston South Apartments* (1984), Ind.App., 461 N.E.2d 723, 729.

Contingent fee contracts between an attorney and his client in a divorce proceeding have been clearly against public policy in Indiana. *Barelli v. Levin* (1969), 144 Ind.App. 576, 247 N.E.2d 847. The rationale in support of this public policy has been that it prevents attorneys from promoting divorce and hindering reconciliation because of their financial interest in the divorce proceedings. However, the factual posture of the case before us presents a challenge to the rationale, since the employment of Goldman and Handlon by Mrs. Meyers came after the divorce had been granted but before the property settlement of the marital estate. In this sense, it is a case of first impression in Indiana and requires a re-statement of the public policy which will include the facts presented here.[1]

1. Contingent fee contracts had traditionally been considered illegal, champertous agreements when Indiana joined a growing number of jurisdictions which approved them under certain circumstances. This Court, in *Barelli v. Levin* (1969), 144 Ind.App. 576, 247 N.E.2d 847, traced Indiana's limited approval of contingent fee contracts in ordinary damage suits where

" '[i]t may and does happen that persons who have rights, but no means to pursue them, are obliged to resort to this means of procuring legal redress.' " *Id.* (quoting *Whinery v. Brown* (1905), 36 Ind.App. 276, 281, 75 N.E. 605, 607). We noted, however, that in spite of some expansive language in *Whinery* there were restrictions on contingent fee contracts as discussed in *Jor-*

From the *Barelli* decision, we discern at least five important reasons for the traditional disapproval of contingent fee contracts. They are: 1) the public policy favoring marriage; 2) disapproval of giving attorneys a financial incentive to promote divorce; 3) the statutory availability of attorney fee awards making contingent fees unnecessary; 4) the potential for overreaching or undue influence in a highly emotional situation; and 5) a need for the court to make an informed distribution of property which includes the obligation of attorney fees. These considerations are reflected in the decisions of numerous other jurisdictions.

The reason cited in virtually every case dealing with this issue is the State's interest in preserving the marital relationship and discouraging divorce. *Coons v. Kary* (1968), 263 Cal.App.2d 650, 69 Cal.Reptr. 712, 713; *In Re Wright* (1982), 89 Ill.2d 498, 61 Ill.Dec. 140, 434 N.E.2d 293, 294; *Barelli v. Levin, supra; Aucoin v. Williams* (1974), La.App., 295 So.2d 868, 873; *Guenard v. Burke* (1982), 387 Mass. 802, 443 N.E.2d 892, 895; *Avant v. Whitten* (1971), Miss., 253 So.2d 394; *Hay v. Erwin* (1966), 244 Ore. 488, 419 P.2d 32. It is thought that a contingent fee contract in contemplation of divorce gives an attorney some incentive to actually promote the divorce or hinder possible reconciliation. Such a financial interest in derogation of marriage offends public policy. Where the circumstances present such a situation no case we have found has directly rejected this policy. *But see Krieger v. Bulpitt* (1953), 40 Cal.2d 97, 251 P.2d 673 (court distinguishes defending from prosecuting a

divorce action in determining propriety of contingent fee contract).

Much of Goldman and Handlon's argument is devoted to refuting the necessity of invoking this policy in the particular facts of this case. Because the divorce had already been granted when they entered their appearances, they argue that they were never in a position to promote divorce or hamper reconciliation. It is true that by the time Goldman and Handlon were employed there was little hope of reconciliation. We note, however, that bifurcated proceedings in divorce cases are not uncommon. *See In Re Gray* (1981), Ind.App., 422 N.E.2d 696; *In Re Lewis* (1977), 172 Ind. App. 463, 360 N.E.2d 855. If contingent fee agreements were permitted only in the property distribution portion of the divorce, the potential for abuse of contingent fee contracts would be increased. Attorneys would be able to counsel clients that they should seek bifurcated hearings and then attempt to negotiate separate fee arrangements for the property settlement portion of the action. Moreover, even attorneys employed after the dissolution would be in a position to encourage delays as a tactical device to exert pressure on the opposing party to make financial concessions. This would give attorneys the appearance of advising delay maneuvers to further their own financial interests. We regard this potential as particularly undesirable in the matrimonial context where the interests of society can best be served by expediting an end to the hostilities between the parties, by unfreezing the marital estate, and by permitting the parties to resume normal and productive living.[2] The evolution away

---

*dan v. Kittle* (1926), 88 Ind.App. 275, 150 N.E. 817:

"The provision in this contract relating to the payment of attorneys' fees is sufficient in itself to condemn the contract as a whole. The law does not sanction or uphold contracts intended to promote divorce, and contracts of that kind are held void against public policy. Any contract intended to or calculated to facilitate the obtaining of a divorce or to promote the dissolution of the marriage relation is illegal and void. A contract and deed of trust containing a stipulation that a divorce will be procured for the wife at her costs is

void. *Rowe v. Young* (1916), 123 Ark. 303, 185 S.W. 438.

An agreement by a woman to pay her attorney any part of the alimony recovered in a suit against her husband for divorce is against public policy and void. *McConnell v. McConnell* (1911), 98 Ark. 193, 136 S.W. 931, 33 L.R.A.,N.S., 1074; ..."
247 N.E.2d at 851.

**2.** *Cf. Coons v. Kary* (1968), 263 Cal.App.2d 650, 60 Cal.Rptr. 712, 714 (dismissal of divorce complaint and filing of suit for separate maintenance, considered in conjunction with contin-

from restrictive divorce laws occurred, in our opinion, not because of a diminished societal interest in preserving the marital relationship but in recognition that society's interest was rarely served by prolonging the agonies of a dying marriage. This does not, however, lessen the impropriety of an attorney having a financial stake in promoting a hostile, adversarial atmosphere between the parties.

Goldman and Handlon contend that the courts disapproved contingent fee contracts between a wife and her attorney because in most states a wife was statutorily entitled to have her attorney fees paid by the husband. *See Barelli v. Levin,* 247 N.E.2d at 853; *Aucoin v. Williams,* 295 So.2d at 872–73; *Shanks v. Kilgore* (1979), Mo. App., 589 S.W.2d 318, 322. Today, they argue, the wife has no guarantee that the court will award her attorneys fees thus the traditional basis for not allowing contingent fee agreements does not exist. We find this argument specious. Certainly, we live in a more enlightened age in which mandatory payment of the wife's attorney fees by the husband[3] has been replaced by a discretionary award of fees to either party.[4] This does not leave the wife in the same position as an ordinary damage claimant who must persuade an attorney to take the risk of getting nothing at all by promising the prospect of a percentage of any recovery. Either party to a divorce comes to prospective counsel with both the statutory right to an equitable share of the marital estate and the possibility of a discretionary award of attorney fees. This is particularly so in the case at bar where there was a substantial marital estate of which the wife was already entitled to $20,-000.00 by virtue of the partial property settlement. Here, as in most divorce cases, there was no all-or-nothing risk to the attorney which justifies the usual contingency fee agreement. We see nothing in this case which compels us to make an excep-

tion to the Code of Professional Responsibility, EC 2–20 which cautions that "... contingent fee arrangements in domestic relation cases are rarely justified."

The fourth reason noted in *Barelli v. Levin, supra* at 853 is the potential for overreaching and undue influence on the part of attorneys negotiating fees in a divorce setting. Divorce and the resulting division of the marital property creates an emotional atmosphere in which distraught parties are especially vulnerable to agreeing to a contract which turns out to be oppressive. The jury in the case at bar found against Mrs. Meyers on her affirmative defenses of fraud and duress, however, we will follow the *Barrelli* rationale in believing that "... all will benefit by maintaining the present public policy of not enforcing such contracts [in divorce actions] no matter how freely and fairly entered into and how reasonable may be the fee thereby produced." *Id.*

The Minnesota Supreme Court recognized the potential for oppressive fee arrangements as one of the factors influencing the prohibition against contingent fee agreements in *Burns v. Stewart* (1971), 290 Minn. 289, 188 N.W.2d 760, 766. Quoting *Klampe v. Klampe* (1917), 137 Minn. 227, 231, 163 N.W. 295 the Court stated:

> "The court will not lend its aid to enforce a contract between an attorney and his client for fees that *savors of oppression* or that is against public policy."

*See also McInerney v. Massasoit Greyhound Association, Inc.* (1971), 359 Mass. 339, 269 N.E.2d 211 (much of the alleged time and effort spent by the attorney was due to his intense desire to obtain certain stock for himself). We do not suggest that the attorneys in the present case were guilty of such overreaching, but we believe the public and the legal profession are better served by avoiding the possibility altogether and eliminating contingency fee ar-

gent fee contract, gives appearance of attorney furthering own financial interest).

**3.** Burns Indiana Statutes Annotated, § 3–1216, (now repealed).

**4.** IC 31–1–11.5–16.

rangements from domestic relations practice.

The final reason which we extracted from *Barrelli* is the concern that the trial court's duty to provide an equitable property settlement and establish support for minor children or a disabled spouse may be thwarted by the existence of a contingent fee arrangement—especially where the court has not been informed of its existence. *Barrelli v. Levin, supra* at 854. The Minnesota Supreme Court, referring to this effect of contingent fees said,

"... in awarding alimony and property to a wife the court must consider her ability to live in the manner to which she has become accustomed.

It follows that the court may deem it necessary to consider what amount the wife has agreed to pay for legal services so that its provisions are not in substantial part rendered nugatory ... a contingency fee is deducted from the amount awarded her and tends to frustrate and defeat the court's effort to make suitable provisions for the wife."

*Baskerville v. Baskerville* (1956), 246 Minn. 496, 75 N.W.2d 762, 767. The possibility of this effect occurring in the case at bar is quite apparent where the property settlement agreement was negotiated by the parties and approved by the court without any indication from the record that the court was informed of the attorneys' claim to a substantial "performance bonus" and their hourly charges. We cannot condone such a practice where the likely result is a direct interference with the court's duty to make fair and suitable provisions for the parties as well as any minor children.

■ Many of the cases cited by Goldman and Handlon approved contingent fee contracts where the courts recognized an independent action involving property rights growing out of or connected with marriage. *See e.g. Olivier v. Doga* (1979), La., 384 So.2d 330; *Burns v. Stewart* (1971), 290 Minn. 289, 188 N.W.2d 760; *Salter v. St. Jean* (1964), Fla.App., 170 So.2d 94. In Indiana it is firmly settled that a decree of divorce by a court having jurisdiction of the subject-matter and the parties is deemed to be an adjudication of all property rights growing out of or connected with the marriage. All such questions, unless excepted therefrom, are considered as put to rest by the divorce decree. *Anderson v. Anderson* (1979), Ind.App., 399 N.E.2d 391, 397 n. 10, and cases cited therein. The majority of jurisdictions hold that a divorce decree that does not contain an adjudication of the parties' property rights does not bar an independent action involving such rights, *see Annot.* 32 A.L.R.2d 1135 (1953); however, that is not the rule in Indiana. *Walker v. Walker* (1898), 150 Ind. 317, 50 N.E. 68. The rationale is that in a divorce proceeding it is the mandatory duty of the trial court to adjust and determine the parties' property rights. *Anderson v. Anderson, supra* at 398. Thus the Second District in *Anderson* held that the wife could not maintain a separate action for fraud in the procurement of the settlement agreement where the dissolution decree was silent on the property rights of the parties. The court held that the trial court had failed to render a decision on an issue statutorily presented to it by the petition for dissolution—the division of marital property.[5] The wife's remedy, therefore, was to secure the court's disposition on the remaining issue—not bringing an independent action for fraud on the agreement. *Anderson v. Anderson, supra* at 401.

With these principles in mind, we hold that even though the decree of divorce and the property disposition portion of the proceedings are bifurcated, with the property being divided after the parties have been granted a divorce, the two proceedings are a continuation of the same action. The property disposition hearing does not constitute an independent action which will support a contingent fee arrangement separate from the fee arrangement in the divorce portion of the proceedings.

---

5. IC 31-1-11.5-11, addressing disposition of property in a dissolution proceeding, provides "the court *shall* divide the property of the parties...." (emphasis added.).

We are mindful of the Supreme Court's decision in *Alderson v. Alderson* (1972), 258 Ind. 328, 281 N.E.2d 82 wherein the Court held that for purposes of appeal the doctrine of indivisibility of the divorce decree was no longer valid. *Id.* at 84. The doctrine of indivisibility was used to estop a party who had accepted any of the benefits of the divorce decree from appealing any other part of the decree. Thus a party who remarried during the pendency of an appeal was precluded from contesting the provisions of alimony, support, or property disposition even though the validity of the marital status of the parties was not put into issue. *Sidebottom v. Sidebottom* (1968), 249 Ind. 572, 233 N.E.2d 667, 672. The Court in *Alderson* noted that application of the doctrine produced results which were absurd:

> "If a party is penalized for remarrying while his or her appeal is pending on matters other than the validity of their marital status, a restoration to normal and productive living is senselessly postponed. The order and tranquility of our society is ill served by insisting on a semistatic marital relationship during a long drawn out appeal. Ind.App., 274 N.E.2d at 712." 281 N.E.2d at 84.

■ We do not view our decision in the case at bar as conflicting with the rule set forth in *Alderson, supra.* It is clear that our public policy favoring marriage over divorce no longer extends to the fiction of the indivisibility doctrine in order to make divorce as unattractive to the parties as possible. However, the interests of the parties advanced by the demise of the indivisibility doctrine are quite different from the interests of attorneys which would be promoted by the independent action concept contended for in the instant case. We believe that the public policy of this State is still advanced by refusing to permit an attorney to acquire a contingent financial interest in any aspect of the divorce proceeding.

The partial summary judgment granted by the trial court is reversed.

HOFFMAN and ROBERTSON (by designation), JJ., concur.